**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| **RONALD GREEN**, | : | Bankruptcy No. 04-10341 KJC |
| Debtor | : | |
| | : | |

# M E M O R A N D U M[1]

**BY:  KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE.**

Ronald Green (the "Debtor") filed a voluntary chapter 7 bankruptcy petition on January 6, 2004.  On July 26, 2004, the United States Trustee (the "U.S. Trustee") filed a motion for dismissal of the Debtor's chapter 7 bankruptcy case pursuant to 11 U.S.C. §707(b), claiming that allowing the Debtor to obtain relief under chapter 7 would be a substantial abuse of the Bankruptcy Code's provisions (the "Dismissal Motion").[2]   The Debtor filed a response opposing the Dismissal Motion on August 20, 2004.  An evidentiary hearing was held on November 24, 2004, after which the parties filed separate post-hearing briefs.  For the reasons set forth below, the Dismissal Motion will be granted.

## FACTS

The Debtor is a married individual who resides in East Fallowfield, Chester County, Pennsylvania with his wife and son.  (Ex. T-2).  The Debtor is employed as a processing

---

[1] This Memorandum constitutes the findings of fact and conclusions of law required by Fed. R. Bankr. P. 7052. The court has jurisdiction over these matters pursuant to 28 U.S.C. § 1334, § 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(A).

[2] By order dated June 2, 2004, the United States Trustee was granted an extension of the deadline set in Fed.R.Bankr.P. 1017(e) for filing a §707(b) dismissal motion.

associate for Vanguard, Inc. and he was employed in the same position for three years prior to filing his bankruptcy petition. (Ex. T-1, Sch. I). As a processing associate, the Debtor's job duties require him to open, batch and sort incoming mail for Vanguard, Inc. (Tr. at 55).[3] The Debtor testified that his gross income for 2004 was approximately $37,000. (Tr. at 56). In his Statement of Financial Affairs, the Debtor reported his gross income as $35,490 for 2003; $33,958 for 2002; and $35,032 for 2001. (Ex. T-1).

The Debtor's Schedule F lists unsecured debt in the total amount of $94,092. (Ex. T-1, Sch. F). Except for a line of credit from Citadel Federal Credit Union in the amount of $4,150 and a loan from Vanguard in the amount of $2,219, the remaining $87,723 unsecured debt is credit card debt. (*Id.*). The Debtor testified that the credit card debt was incurred as a result of his "speculating in the stock market" that "did not go real well." (Tr. at 72).

The Debtor owns two parcels of real property with his wife, as tenants by the entirety. The first property is his residence, which was listed on his Schedules as having a market value of $225,000, and is subject to a mortgage lien in the amount of $95,000 (the "Residence").[4] (Ex. T-1, Sch. A). The second property was purchased from the Debtor's grandmother's decedent's estate and is listed on the Schedules as having a market value of $60,000 (the "Rental Property). (Tr. at 60, Ex. T-1). The Debtor and his wife receive $550 monthly rental income from the Rental Property (Ex. T-2), but the Debtor claims that, after deducting the Rental Property's expenses, he and his wife have never made a profit on the Rental Property. (Tr. at 61).

On January 6, 2004, along with his chapter 7 bankruptcy petition, the Debtor filed a

---

[3]Citations are made to the transcript of the hearing held on November 24, 2004.

[4]The holder of the mortgage lien, Citadel Federal Credit Union, is the Debtor's only secured creditor. (Ex. T-1, Sch. D).

Schedule I, showing his net monthly income in the amount of $1,327.78. (Ex. T-1, Sch. I). The income total included estimated overtime pay of $263.86 monthly. On May 14, 2004, the Debtor filed an amended Schedule I, which added $550 of income from the Rental Property, raising the total monthly income amount to $1,877.78. (Ex. T-2).

The U.S. Trustee, however, argues that the Debtor's income is substantially higher. The Debtor's pay stub for period ending July 30, 2004 (the "Pay Stub") shows that the Debtor received a biweekly payment in the amount of $1,826.80.[5] (Ex. T-3). The Debtor's net bi-weekly payment as stated on the Pay Stub was $955. (*Id.*). However, the year-to-date gross earnings amount on the Pay Stub is $45,044.51. (*Id.*). Using this year-to-date figure, the U.S. Trustee calculated the Debtor's gross income for 2004 to be $77,219.16 annually or $6,434.93 monthly. (Ex. T-4, Tr. 20-22). After the U.S. Trustee added in monthly rental income and deducted estimated payroll expenses, the U.S. Trustee calculated the Debtor's net monthly income to be $4,124.40. (Ex. T-4).[6]

The Debtor argues, however, that U.S. Trustee's calculations do not accurately reflect his net monthly income, because the Pay Stub includes (i) flex credits, in the year-to-date amount of $7,745.28, which are an insurance benefit that the Debtor cannot receive in cash (Tr. at 57),[7] (ii) payment of $6,450 under the company's profit-sharing plan, which is a once-a-year payment that can vary in amount from year-to-year (Tr. at 58), and (iii) overtime payments that the Debtor

---

[5]The U.S. Trustee obtained a copy of the Pay Stub through discovery. (Tr. at 15-16).

[6]At trial, the U.S. Trustee's exhibits were explained through testimony of a certified fraud examiner. (Tr. at 8 - 34).

[7]The U.S. Trustee argues that the Debtor later changed his testimony and admitted that he received the flex benefit in cash. (Tr. at 76). The testimony on this issue is unclear.

expected would decrease because the company had hired extra full-time and temporary employees (Tr. at 59).

The Debtor also filed Schedule J with his chapter 7 bankruptcy petition, listing total monthly expenses of $4,158.90.  (Ex. T-1, Sch. J).  At the hearing on November 24, 2004, the Debtor submitted an exhibit (Ex. D-1) which revised Schedule J by increasing the total monthly expenses to $5,326 and indicating how the expenses are shared between the Debtor and his wife.[8]  According to Ex. D-1, the Debtor pays monthly expenses of $1,910 and his wife pays the remaining monthly expenses of $3,416.[9]  The Debtor testified that his wife pays most of the household expenses and, for a number of years, has taken care of their home finances.  (Tr. at 101).  The U.S. Trustee argues that, based upon his deposition of the Debtor on August 18, 2004, the Debtor's share of his household monthly expenses should be $1,763.  (Ex. T-6).

## DISCUSSION

The U.S. Trustee seeks dismissal of this chapter 7 bankruptcy case under Bankruptcy Code §707(b), which states, in pertinent part:

> (b)  After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter.  There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. §707(b)(2005).  The parties agree that the debts in this case are primarily consumer

---

[8] On November 23, 2004, the Debtor filed an Amended Schedule J (docket no. 30), which increased the Debtor's monthly household expenses to the amount of $5,779.  This amount does not match the totals on Exhibit D-1.

[9] The Debtor's wife is not a co-debtor in the bankruptcy case.  The U.S. Trustee deduced that the wife's annual income was approximately $55,000, based upon the Debtor's and his wife's joint tax return for 2002 which listed a total income of $88,481.  (Tr. at 38-39).

4

debts. (Tr. at 6). The open issue, then, is whether granting chapter 7 relief in this case would constitute "substantial abuse."

By enacting §707(b), "Congress meant to deny Chapter 7 relief to the dishonest or non-needy debtor." *In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989) *citing In re Walton,* 866 F.2d 981, 983 (8th Cir. 1989). However, the term substantial abuse is not defined in the Bankruptcy Code. "Therefore its meaning is to be determined by the courts. Whether such abuse exists in a case is largely left to the court's discretion." *In re Miller*, 302 B.R. 495, 498 (Bankr.M.D.Pa. 2003). Without the benefit of controlling law on this issue, the Bankruptcy Court for the Middle District of Pennsylvania, in *Miller*, turned to decisions in other circuits for guidance and discussed the different formulations courts have used in a §707(b) substantial abuse analysis.

The Ninth Circuit Court of Appeals uses an "ability to pay" test, holding that "the debtor's ability to pay his debts when due, as determined by his ability to fund a chapter 13 plan, is the primary factor to be considered in determining whether granting relief would be a substantial abuse." *Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 914 (9th Cir. 1988). Although the Ninth Circuit noted that inability to pay does not shield a debtor from dismissal under §707(b), it decided that an ability to pay, standing alone, supports a conclusion of substantial abuse. *Kelly,* 841 F.2d at 915.

The Fourth Circuit Court of Appeals favors a "totality of the circumstances" approach to a §707(b) analysis. *Green v. Staples (In re Green)*, 934 F.2d 568 (4th Cir. 1991). In light of the Code's presumption in favor of granting a debtor's request for chapter 7 relief, the Fourth Circuit held that solvency, alone, should not provide a basis for finding substantial abuse. *Green*, 934 F.2d at 572. In addition to comparing a debtor's future income to his future necessary expenses,

5

a court using the totality of the circumstances approach may consider factors such as:

(1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;
(2) whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
(3) whether the debtor's proposed family budget is excessive or unreasonable;
(4) whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
(5) whether the petition was filed in bad faith.

*Id.*

The Sixth Circuit Court of Appeals uses a "hybrid" approach to the §707(b) analysis.[10] *Krohn*, 886 F.2d at 126-27. The *Krohn* Court held that a debtor's ability to repay debts out of future earnings could, without more, warrant dismissal for substantial abuse. *Krohn*, 886 F.2d at 126. However, the *Krohn* Court also considered other factors relevant to a debtor's needs, such as whether the debtor enjoys a stable source of future income, whether a debtor is eligible for relief under chapter 13 of the Bankruptcy Code, whether state remedies could ease his financial predicament, the degree of relief obtainable through private negotiations, and whether a debtor's expenses can be reduced significantly without depriving him of adequate food, clothing, shelter or other necessities. *Id.* at 126-27. Furthermore, the hybrid approach "permits the court to examine whether a debtor can repay either a significant *percentage* of his total unsecured debt or a significant *amount* of money, regardless of the percentage payout, to unsecured creditors....By considering both the percentage and the total amount of unsecured debt that can be repaid, the court neither penalizes debtors who avoid amassing significant debt immediately prior to filing nor rewards those who do." *Miller*, 302 B.R. at 500 (citations omitted, emphasis in original).

---

[10]In *Miller*, the Court noted that commentators referred to the *Krohn* decision as a "'hybrid' between the positions enunciated in *Kelly* and *Green*. *Miller*, 302 B.R. at 499.

Finally, the *Miller* Court observed that some courts require "evidence of misconduct, impropriety, or lack of good faith in filing [as] a prerequisite to a finding of substantial abuse." *Miller,* 302 B.R. at 499 (citations omitted).  The *Miller* Court declined to follow these cases, noting that one Circuit Court has rejected this analysis (*United States Trustee v. Harris*, 960 F.2d 74, 76 (8th Cir. 1992)) and more recent cases have not followed this view.

Upon consideration of these approaches, I conclude that the hybrid approach is the most equitable and "best resolves the tension between the conflicting policies of granting the debtor a fresh start while thwarting the abuse of consumer credit."  *Miller*, 302 B.R. at 500 *quoting In re Ontiveros*, 198 B.R. 284, 291 (C.D.Ill. 1996).

I first look to the U.S. Trustee's allegations of the Debtor's ability to pay his unsecured debt.  The U.S. Trustee proffers a number of potential chapter 13 plans that could be funded from the Debtor's disposable income, as calculated by the U.S. Trustee, and could provide partial payment of the Debtor's unsecured debt.[11]

As discussed in the Facts, above, the Debtor lists his total monthly income on Amended Schedule I as $1,877.78  (Ex. T-2), while the U.S. Trustee calculates the Debtor's monthly income to be $4,124.40 (Ex. T-4).  I agree with the Debtor that the U.S. Trustee's figure, which is based on an annual income of $77,219.00, is too high.  It presumes the Debtor's overtime will continue at the same high level for the remainder of the year (despite the Debtor's testimony to the contrary (Tr. at 59)) and does not treat the Debtor's distribution under his employer's profit-

---

[11]"Disposable income" is defined in Bankruptcy Code §1325(b)(2) as "income which is received by the debtor and which is not reasonably necessary to be expended - - (A) for the maintenance or support of the debtor or a dependent of the debtor, including charitable contributions...to a qualified religious or charitable entity or organization...; and (B) and if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business."

sharing plan as a one-time distribution.

On the other hand, the Debtor's monthly income figure is too low. The amount listed on Amended Schedule I as the Debtor's monthly gross wages ($2,453.86) is too low because, if multiplied by 12, it amounts to only $29,446 gross wages annually. The total year-to-date earnings on the Pay Stub (in the amount of $45,044.51) was well beyond this amount as of July 30, 2004. Moreover, the Debtor's gross wage figure does not correlate to the annual gross income from employment reported by the Debtor for the years preceding bankruptcy. (Ex. T-1). It also deeply discounts the Debtor's historic overtime earnings and fails to include the profit-sharing distribution.

In an attempt to cut through the parties' opposing arguments to obtain a reasonable picture of the Debtor's disposable income, I look to the Debtor's net pay figures. The year-to-date net pay on the Debtor's Pay Stub was $25,020.78. Assuming that the Debtor received the low net pay figure found on Amended Schedule I (Ex. T-2) of $1,327.78 per month for the remaining five (5) months of the year, the Debtor's total annual net pay would be $31,659.68, which (if spread over twelve (12) months), is equal to $2,638.31 "net monthly take home pay." By adding the Debtor's monthly rental income ($550) as shown on Schedule I, I find that the Debtor's monthly income for Schedule I purposes is $3,188.31.

To complete my estimation of the Debtor's disposable income, I must determine the amount of the Debtor's monthly expenses. As described in the Facts, above, the U.S. Trustee argues that the Debtor's share of his household's monthly expenses is $1,763 (Ex. T-6), while the Debtor argues that his expenses are $1,910 (Ex. D-1). Even if I were to accept the Debtor's monthly expense figure and subtract that from the monthly income set forth above, then the

8

Debtor's disposable income would be $1,278.31 per month ($3,188.31 - $1,910 = $1,278.31).

The amount of a distribution to unsecured creditors under a potential three year chapter 13 plan would be as follows:

$1,278.31 x 36 months = $46,019.16

less trustee commission (10%) = $4,601.92[12]

Repayment to unsecured creditors = 41,417.24 or 44.02%[13]

The foregoing is, by no means, a certainty.  The exercise demonstrates, however, that this Debtor has disposable income that would allow for a significant payment to unsecured creditors.  One of the U.S. Trustee's proposed chapter 13 plans, which assumed a gross annual income of $42,206.84 that did not include overtime or the profit-sharing distribution, estimated monthly disposable income of $847.64, resulting in a 29.19% payment to unsecured creditors.[14]  Whether the potential distribution to unsecured creditors could be 44% or 29%, there is sufficient evidence that the Debtor can repay a significant percentage of unsecured debt.[15]

Other courts have found substantial abuse under §707(b) "even though a debtor's potential to repay creditors falls below the 50% mark...some courts have found substantial abuse

---

[12] Following the U.S. Trustee's formula, I have deducted a trustee commission of ten percent (10%), which the U.S. Trustee claims is the maximum commission amount.

[13] The percentage payment is calculated using the amount of unsecured debt on Schedule F of $94,092.

[14] See proposed "Plan C" in the Brief of the United States Trustee dated January 21, 2005 (docket no. 37), p. 34.

[15] With some belt-tightening, the Debtor may be able to pay unsecured creditors even more.  For example, the Debtor's Pay Stub shows a 401K Plan contribution in the Debtor's pre-tax deductions of $67.14 (or $134.28 per month).  Courts in this circuit have held that voluntary contributions to a retirement plan are not necessary for a debtor's support and maintenance.  *See Sarasota, Inc. v. Weaver*, No. 04-1557, 2004 WL 2514290, *3 (E.D.Pa. Nov. 5, 2004) *citing In re Anes*, 195 F.3d 177, 180-81 (3d Cir. 1999).

to exist where a debtor can pay less than 20% to creditors through a three-year chapter 13 plan." *Miller*, 302 B.R. at 501 *citing In re Attanasio*, 218 B.R. 180, 189 n.6 (Bankr.N.D. Ala. 1998)(collecting cases) and *In re Vianese*, 192 B.R. 61 (Bankr.N.D.N.Y. 1996)(substantial abuse when debtors could pay 19% to creditors by eliminating unnecessary expenses).  I do not here adopt a "bright line" percentage test, but conclude that the Debtor meets the "ability to pay" factor of the hybrid test, which weighs heavily in favor of dismissal for substantial abuse.

Reviewing the other factors of a 707(b) analysis supports dismissal.  The Debtor enjoys a stable source of income and is eligible for chapter 13 relief.   There is no evidence that the Debtor filed his chapter 7 petition based upon a sudden illness, calamity, disability or unemployment.  Instead, the petition was filed to relieve the Debtor of substantial credit card debt, but his unsecured creditors should not bear the cost of his unsuccessful dabbling in the stock market.   The Debtor's expenses do not strike me, generally, as being excessive or unreasonable and I do not find any evidence that the petition was filed in bad faith.[16]  Here, the Debtor falls within the category of "non-needy" debtors that may be denied chapter 7 relief under §707(b).

For these reasons, the Debtor's chapter 7 will be dismissed under §707(b), as chapter 7 relief  would constitute a substantial abuse of the provisions of the Code, since the Debtor has not committed to using his future income to pay his creditors.  However, §706 provides the Debtor with a right to convert his case to chapter 13, if he so wishes.  Therefore, my order dismissing this case will not become effective for ten (10) days to allow the Debtor an

---

[16] Although the petition was not filed in bad faith (*see Tamecki v. Frank (In re Tamecki)*, 229 F.3d 205 (3d Cir. 2000), the Debtor's inconsistent amendments of Schedule J (regarding his expenses) may suggest a certain lack of care in dealing with the court regarding his disposable income.

opportunity to convert his case to one under chapter 13.  An appropriate order follows.


BY THE COURT:



KEVIN  J. CAREY
UNITED STATES BANKRUPTCY JUDGE


Dated:   October 21, 2005

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| **RONALD GREEN**, | : | Bankruptcy No. 04-10341 KJC |
| Debtor | : | |
| | : | |

**ORDER**

**AND NOW**, this 21st day of October, 2005, upon consideration of the "Motion of the United States Trustee To Dismiss Pursuant To 11 U.S.C. §707(b)"(docket no. 23)(the "Motion"), and the opposition of the Ronald Green (the "Debtor") thereto, after notice and an evidentiary hearing on the Motion, and for the reasons set forth in the accompanying Memorandum, is hereby **ORDERED** and **DECREED** that the Motion is **GRANTED** provided, however, that the Debtor will be given an opportunity to convert this case to one under chapter 13. If no motion to convert is filed within ten (10) days, this case shall be dismissed.

BY THE COURT:


KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Copies to:

Ronald M. Green
245 Fallow Lane
East Fallowfield, PA 19320

Jay G. Fischer, Esquire
Valocchi, Fischer & Laverty, LLC
342 E. Lancaster Avenue
Downingtown, PA   19335

Frederic J. Baker, Sr., Esquire
Senior Assistant United States Trustee
833 Chestnut Street, Suite 500
Philadelphia, PA 19107

Timothy B. McGrath, Clerk, U. S. Bankruptcy Court
Pamela Blalock, Courtroom Deputy Clerk